KUMBA, Plaintiff in error, vs. GILHAM, Defendant in error.

*April 27 — May 16, 1899.*

*Parent and child: Liability for torts: Agency: Scope of authority: Ratification: Negligence: Proximate cause.*

1. There is no general liability of a father for torts of a minor son. Such liability arises only when the fact of agency for the father is proved, and the act is within the scope of the agency; and no presumption of agency results from the relationship.

2. While the child may be engaged in some undertaking beneficial to the father, it is not sufficient to charge the latter with the tort, unless such engagement is in accordance with the direction or authority of the father.

3. A father, desiring to take his daughter to her school, ordered the liveryman to send the team to his shop, informing him he would go in place of his son. A third person interfered, took the team, daughter, and son, and started, without the father's knowledge. On learning this the father attempted to prevent his son's going, but was too late. While returning, the kingbolt broke, the front wheels came out, and the buggy was left by the son, in an upright position, as far out on the side of the road as he could, so that the nearest part of it was about ten feet from the traveled track, the top half down, and the front wheels separated from the body of the buggy. The liveryman, on inquiry of the father, promised he would send for the disabled buggy. About a week thereafter, the buggy still remaining where the son had left it, but having been overturned by some unknown agency, the plaintiff's team, while driven along the road, took fright at the buggy and ran away causing damage. *Held*, that while the purpose of the father had been accomplished, there was a complete absence of any contact of the father with the transaction, in the way of instruction or authoriza-

Kumba vs. Gilham.

tion, and the son could not be said to be engaged upon the business of the father.

4. The fact that the defendant asked the liveryman whether he or the defendant should go after the broken buggy did not show a ratifi-. cation of the son's acts.

5. The broken buggy, as left by the son on a country road remote from habitations, was not an object likely to frighten an ordinarily quiet and docile horse.

6. It was not reasonable to anticipate in such case that, before the buggy was sent for and removed, it would be interfered with by others.

7. If by such interference the situation and position of the buggy had become such as would likely frighten horses, the leaving of it by the side of the road by the son, in a different position, not dangerous, cannot be said to be the proximate cause of plaintiff's injury.

Error to review a judgment of the circuit court for Marathon county: Chas. V. Bardeen, Circuit Judge. *Affirmed.*

The defendant on a Wednesday or Thursday in November hired from a liveryman a team to send for his daughter, asking for a quiet team as he wanted to send his son, about fourteen years old. He at the same time notified the liveryman that he should want a team on Sunday to take his daughter back to her school. The son went, and brought home his sister. On Saturday the father telephoned the liveryman that he would not send his son back with the sister, as it was too cold, but would go himself, and directed him to send the team to his (the father's) meat market at 9 o'clock Sunday morning. On Sunday morning one Poronto, who was teaching school in the same vicinity as the defendant's daughter, went to the livery stable, and said that he would take the team which defendant had ordered, as he had arranged to ride out with them, and that the son would go with them and bring the team back. He was accordingly given the team by the liveryman, went to defendant's house, got the son and daughter, and started off, all without any knowledge or consent on the part of the defendant, who, being disappointed by the nonarrival of the

team at his market, telephoned to the liveryman, and learned that Poronto had called for it, whereupon he hastened to his house in order to prevent his son's going, but was too late, the party being a mile away by that time.   On the way back the young man experienced an accident, the front wheels coming out from under the buggy and breaking the kingbolt, when he was still about ten miles from home.   He thereupon ran the buggy just as far out on the side of the road as he could, so that the nearest part of it was somewhere from nine to twelve feet from the nearest traveled track, and went home without it.   On his son's arrival the defendant telephoned the liveryman of the fact of the breakdown, and inquired if the liveryman would send for the disabled buggy, or wished him (the father) to do so.   The liveryman said he would.   On the Wednesday following, the plaintiff, driving a span of horses which he had had four or five weeks, and which he testified were well broken and gentle, but which numerous other witnesses testified were skittish, and one of them greatly given to shying and wheeling out of the road at any unusual object, was driving on the road where the buggy was.   It had been changed from its natural posture, right side up, in which the son left it, so that the dashboard was up in the air and the top rested on the ground.   The horses shied and threw plaintiff out, and then ran away, causing some damage.   It was proved that the buggy was of the most ordinary type, such as was commonly driven throughout that neighborhood.   The liveryman estimated that there were a thousand practically like it in Wausau, and that nearly every farmer had one.

A verdict was rendered for the plaintiff upon the first trial, which the court set aside, granting a new trial.   Upon the second trial the court ordered a verdict for the defendant.   Appellant assigns as error both the granting of a new trial and the ordering of a verdict for the defendant on the second trial.

The cause was submitted for the plaintiff in error on the brief of *Mylrea, Marchetti & Bird*, and for the defendant in error on that of *Ryan, Hurley & Jones*.

DODGE, J.   1. The primary question of law here presented is whether the defendant is liable for the acts of his son, assuming them to be negligent.   As to this question the facts are without dispute.   The law is well settled that no general liability of the father for torts of a minor son exists. Such liability in general results only from the rule of *respondeat superior* when the fact of agency for the father is proved, and no presumption of agency results from the domestic relationship.   17 Am. & Eng. Ency. of Law, 392; Schouler, Dom. Rel. § 263; *Schaefer v. Osterbrink,* 67 Wis. 495; *Winkler v. Fisher,* 95 Wis. 355; *Moon v. Towers,* 8 C. B. (N. S.), 611.

True, it is said in *Schaefer v. Osterbrink* that, where an injury is caused by a minor in driving his father's team upon the father's business, it may suffice to show that such acts have been customarily done in the presence and with the knowledge of the father; but this rule bears only on sufficiency of the proof of the agency or authority, and has no application to the present case.

Again, there is a line of cases sustaining liability for acts done in the father's presence (*Strohl v. Levan,* 39 Pa. St. 177), or where acts are done by very young children on the father's premises, likely to frighten passing teams, and it was shown that similar conduct had been customary, to the father's knowledge (*Hoverson v. Noker,* 60 Wis. 511).   These cases are predicated on the assumed power of control by a parent over his children, and the latter upon the responsibility of one who maintains on his premises anything known to be dangerous or having a tendency to injure others.   But, apart from these exceptional aspects of the question, proof is essential of the conferring of authority to do something for

Kumba vs. Gilham.

the father, within the scope of which is the tort alleged; and, as Mr. Schouler sums up the subject, it is always a defense to show that the parent was not able to prevent the act complained of. It is not sufficient that the child was engaged in some undertaking beneficial to the father, or which he desired to have accomplished, unless such engagement be in accordance with directions or authority from the father. *Winkler v. Fisher, supra; Moon v. Towers, supra.*

In the case at bar there is a complete absence of any contact of the father with the transaction, in the way of instruction, authorization, or even interest in the enterprise, further than the mere fact that an object which he (the father) desired was being accomplished, namely, the transportation of the daughter to her school. But this purpose was not being accomplished in the manner desired by the father, nor in accordance with any instructions or authority from him. His plan was to hire a different team, and drive his daughter out himself, being unwilling that the son should go. That purpose, without his consent and beyond his control, was interrupted and modified to suit the convenience of a third person, Poronto, who desired to travel to the same vicinity, and who obtained from the liveryman the team in question. True, he said he desired to take the team which had been ordered by the defendant, but no authority or even knowledge on the defendant's part is shown. The team, of course, had to be brought back, and the son went for that purpose; but the father did not authorize it, and would have prevented it, had it been within his power. It is hardly possible, therefore, to say even that the son was engaged upon business of the father. Quite as much was he engaged upon the business of Poronto. Even if it can be said that the son was in charge of the father's team,— a proposition in much doubt,— he clearly was not so in charge by any authority or consent, but, on the contrary, against the wishes and beyond the control of the father.

The suggested acts of ratification are wholly insufficient to accomplish that result. They consist merely in an inquiry of the liveryman as to whether he would go after the disabled buggy, or wished defendant to. This was after the event, when the defendant had no control over the matter, when he could not undo what had been done; and the words are not significant of approval of that which had been done without his consent, and which he would have prevented if he could. *Heath v. Paul*, 81 Wis. 532, 538.

2. It seems to us clear that a buggy left as this was, with the top half down, right side up, although the front wheels were gone, standing ten feet out of the traveled track of a country road through the woods, could not be calculated to frighten and render uncontrollable ordinarily quiet and docile horses. They are accustomed to pass such buggies many times daily when traveling the highways, and to see them at home. *Nichols v. Athens*, 66 Me. 402.

If, then, we assume that the buggy, in the situation and posture which it occupied at the time of the injury, had become a thing likely to frighten reasonably quiet horses, the question arises, Was the act of the son in leaving the buggy by the side of the road in a different posture, not so dangerous, the proximate cause of the injury? That involves the permissibility of the inference by the jury that a reasonably prudent person, leaving a disabled buggy ten feet outside of the traveled track of a highway until it can be sent for by the owner, must reasonably anticipate that, before it is so sent for and removed, it will be interfered with by others, and put in a posture likely to frighten horses; involving considerable gratuitous exertion for the mere purpose of doing harm. The statement of the question renders argument unnecessary. Such act is one of vandalism, void of benefit to any third person, and not to be anticipated upon a country road a long distance from habitations.

We conclude, therefore, on both of the grounds above

stated, that the defendant was, by undisputed evidence, shown not to be liable, and that a verdict in his favor was properly directed, which fully disposes of the case. No prejudicial error can, therefore, have been committed in setting aside the first verdict and granting new trial.

*By the Court.*— Judgment affirmed.

BARDEEN, J., took no part.