## Elmer E. Dick v. Anna Swenson.

### Gen. No. 13,481.

1. VERDICT—*when set aside as against the evidence.*   When a
verdict rests solely on the uncorroborated testimony of the plaintiff,
contradicted by that of the defendant, whose testimony is cor-
roborated by other witnesses, it cannot be sustained.

2. TORT—*when father not liable for, committed by his son.*
A father is not liable for the torts of his children, committed

without his knowledge or consent, and not in the course of his employment, or by his directions.

3. REMANDMENT—*when should be ordered*. The remandment of a cause for another trial should not be ordered where two trials have been had so that it may be presumed that all the evidence available has been produced—all such evidence being insufficient to justify a judgment.

BROWN, J., dissenting in part.

Action in case for personal injuries. Appeal from the Circuit Court of Cook county; the Hon. JOHN GIBBONS, Judge, presiding. Heard in this court at the March term, 1907. Reversed. Opinion filed October 28, 1907. Rehearing denied November 11, 1907.

DANIEL F. FLANNERY, for appellant.

ANDERSON & ANDERSON, for appellee.

MR. JUSTICE ADAMS delivered the opinion of the court.

Appellee was plaintiff and appellant defendant in the trial court. It is averred in the declaration that the defendant "had the care and custody of his son, a boy about ten years old, and allowed said boy to have and shoot with an air gun loaded with shot, knowing that the boy shot around the house with said air gun loaded with shot, and that it was dangerous and improper to allow the said boy to shoot with said air gun loaded with shot." Said boy, "July 31, 1901, shot, with said air gun loaded with shot, into plaintiff's right eye, plaintiff being, then and there, a servant in defendant's employ, and in the exercise of due care for her safety, and, thereby, plaintiff lost the use of her right eye permanently, etc., and incurred divers expenses amounting to $100 in endeavoring to be cured," etc.

The defendant pleaded the general issue. The jury found the defendant guilty and assessed the plaintiff's damages at $3,750, from which sum the plaintiff remitted $1,000, and the court, after overruling the defendant's motions for a new trial and in arrest of judgment, rendered judgment for the sum of $2,750.

Appellant's counsel contends that the verdict is manifestly against the weight of the evidence, and that the court erred in giving certain instructions at plaintiff's request.

The evidence tends to prove, without contradiction, that July 31, 1901, Jewell Dick, the defendant's son, was shooting his air gun, loaded with shot, at the window of defendant's kitchen, and that one of the shot hit the right eye of the plaintiff, causing an impairment of the sight of the eye, which probably would result in total loss of the sight of that eye. The plaintiff, at the time, was standing in the kitchen at the window, looking out. The defendant and his wife were absent and plaintiff was the only person in the house. She testified, in substance, that she was employed as a servant by the defendant in 1898, and continued in his employment until October, 1901; that defendant's family consisted of himself, his wife, and his son Jewell, who was about ten years old at the time of the accident, which occurred July 31, 1901, about two o'clock in the afternoon. About six weeks before the accident, Mrs. Sheridan, who lived in the next house to the defendant's, gave Jewell an air gun, which he kept in the front vestibule of the house all the time when he was not shooting with it. The vestibule was just a trifle larger each way than the entrance door to it, and the defendant had to pass through it each day several times. Jewell had the gun about four weeks before the accident, before he got any shot for it. He bought shot himself about two weeks before the accident. I only know of his buying shot once. He used shot not quite as large as green peas, and used the gun to shoot at trees.

The following occurred in plaintiff's examination in chief:

"Q. Do you know if Mr. Dick saw him shoot at any time? A. Yes, sir.

Q. Mention some time. A. One Thursday afternoon,

he was sitting on the porch when he was shooting. When I was coming home he was sitting on the porch there, and the boy was shooting right in the front.

Q. What was Mr. Dick doing on the porch? A. He had his paper, sitting there reading.

Q. And how long was the boy out there shooting? A. About an hour.

Q. Do you remember any other time? A. No."

The cross-examination of the plaintiff shows that her testimony that the defendant saw Jewell shooting was a mere conclusion. She testified that the defendant was reading with his paper in front of him, when she looked at him, and before she looked at the boy, and that after she looked at the boy she did not again look at the defendant. On cross-examination she evaded answering questions as to whether she saw the defendant looking at his son, while, as she says, the boy was shooting. She further testified, in substance: The night before the accident she found the gun in the back yard and took it round to the front, where defendant was, and said to him, "Look here, this gun is all rusted and spoiled; it has been laying in the yard," and defendant said, "He is a d—l of a boy; he can't keep anything." On Sunday morning, about three weeks before the accident, Jewell went out shooting before his father got up, and when the latter came down to breakfast he asked where Jewell was, and plaintiff said she didn't know, when shortly Jewell came in and defendant asked him where he had been, and he said, "I have been shooting with my gun," and defendant said, "I don't want you to shoot on Sunday."

The defendant testified that he first knew his boy had an air gun when he came home one night and the boy told him Mrs. Sheridan had given him one, and he, defendant, then told the boy to put it up in his room and keep it there, and not to get any shot for it; that he did not want him to shoot it under any

circumstances; that the gun was put up on the north wall of the boy's play-room that evening, and was never taken down, so far as defendant knew, till the day of the accident. Defendant was in the play-room frequently and saw it there and also other things—a fish head, a badger skin, a pair of miniature oars, an Indian club and pictures. The first he knew of the boy having shot and used the gun was July 31st, when his wife telephoned him in the afternoon of that day, and the boy never, in his presence, or with his knowledge, shot the gun about his premises.

In the cross-examination of the plaintiff she testified that about five minutes after the accident she saw Mrs. Sheridan lay the gun down in the back yard, and that afternoon she, plaintiff, saw defendant, when he came home, have the gun in the back yard, and that he shot it in the presence of his wife and Jewell. The defendant testified: ''The circumstances testified to by plaintiff, that on a certain afternoon I was on the veranda and Jewell was in the front yard, shooting the gun into the trees, never happened. I did not, on a certain Sunday, while at breakfast, ask my son where he had been, nor did he reply that he had been out shooting the air gun, nor did I say to him, on that occasion, that I did not want him to shoot the air gun, or gun, on Sunday. No such conversation as that ever took place. Miss Swenson never brought that gun into the house and told me that Jewell had left it out in the grass, and it was rusty, nor words to that effect; nor did I make a reply in regard to his carelessness, or anything of the sort. No such thing ever happened. I never shot that gun before or after the day of the accident. I never saw the gun after the day of the accident. I did not even see the gun when I got home that day, and have never seen it since.''

Jewell Dick testified, in substance, that immediately after Mrs. Sheridan gave him the air gun he took it home, and that evening his father made him put it on

the wall in his room and told him not to use it, and that he could not have any shot, and that the first time he had any shot was on the day of the accident, when he himself purchased five cents' worth of shot; that he put the gun on the wall of his play-room, as his father had told him to do, and that it remained there till the day of the accident, and was never kept or left in the front vestibule till the day of the accident, and on that day, during the lunch hour, he left the gun and shot in the vestibule while he was in the house to lunch. He says that he never shot in the front yard while his father was at home, or any place when his father was in sight, and denies the Sunday incident and conversation testified to by plaintiff. Mrs. Sheridan, defendant's next neighbor, who gave the air gun to Jewell, testified that she never saw Jewell shoot the gun around the premises till the day of the accident; that she heard of the accident about two o'clock and immediately went to defendant's premises, and met Jewell on the front sidewalk, with the gun in his hand, and took it from him and to her house, and put it down in the wine closet, in the cellar of her house, and later, when she was putting away fruit, she found it there and destroyed it, and that, after she took it from Jewell, it never went back into the hands of any of defendant's family. She also testified that she went through the front vestibule of defendant's house many times that summer and never saw the air gun or anything else in the vestibule.

Vera Muchmore testified that she used to live in the Sheridan house and was well acquainted with Jewell, and used to go to defendant's house to play with Jewell almost every day, and that his air gun was on the wall of his play-room; that she thinks she saw it there fifteen times at least, and also saw on the wall a muskallonge head, a beaver or badger skin, some paddles and an Indian club, and that she went into the house through the front vestibule and never saw the air gun or shot there.

There is other evidence, to which we think it unnecessary to refer.

It is averred in the declaration that the defendant allowed Jewell to have an air gun and to shoot with an air gun loaded with shot, knowing that the boy shot around the house with the air gun so loaded. It is necessary to a recovery for the evidence to support these allegations. The plaintiff's evidence, which it is claimed supports the averment of defendant's knowledge, in the premises, is wholly uncorroborated, while the defendant, in his testimony, positively denies knowledge that his son had ever used the air gun prior to the time of the accident, and he is fully corroborated by the testimony of his son, Jewell; in addition to which material parts of the plaintiff's testimony are contradicted by other witnesses, whose evidence is corroborative of defendant's testimony. We think the verdict manifestly against the weight of the evidence.

When the verdict rests solely on the uncorroborated testimony of the plaintiff, contradicted by that of the defendant, whose testimony is corroborated by other witnesses, it cannot be sustained.

In Peaslee v. Glass, 61 Ill. 94, the court say: "It belongs to the plaintiff to make out a case. The burden of proof is upon him, and where the issue rests upon the sworn affirmation of one party and the sworn denial of the other, both having the same means of information and both unimpeached, and testifying to a state of facts, equally probable, a conscientious jury can only say that the plaintiff has failed to establish his claim. Without saying that this court would set aside a verdict for the plaintiff, rendered in such cases, on the ground alone that it was not sustained by the evidence, we must set aside one resting only upon the evidence of the plaintiff when that is contradicted not only by the defendant, but also by another witness, and there are no elements of probability to turn the scale."

We think that in this case there are no elements of probability to turn the scale.

Peaslee v. Glass has been followed by this court in a number of cases, and is cited with approval by the Supreme Court in W. C. R. R. Co. v. Lieserowitz, 197 Ill. 607, 615.

In 21 Am. & Eng. Ency. of Law, p. 1057, the law in relation to the liability of a parent for the tort of his infant child is thus stated: "The general rule is that a parent is not liable in damages for the torts of his minor child, even though the child lives with the parent and is under his control, when such acts were done without his authority, knowledge, or consent, had no connection with his business, were not ratified by him, and were of no benefit to him."

See, also, Schouler's Domestic Relations, 3rd ed., sec. 263.

In Wilson v. Garrard, 59 Ill. 51, suit was brought against Gossard for the trespasses of his children, in worrying and maltreating the plaintiff's hogs while they were passing over his land in going to and returning from school. The court say: "A father is not liable for the torts of his children committed without his knowledge or consent, and not in the course of his employment, or not under directions."

In Paulin v. Howser, 63 Ill. 312, a like case, the court say: "A father is not, nor can he be held responsible for the unauthorized trespasses of his minor children. In that respect the child occupies the same relation to the father as does a servant. He is liable for the acts of either, when performed under his directions, or in the course of their general employment; but not for their trespasses committed independent of their employment and not under directions."

In other jurisdictions the law has been held to be as stated in Wilson v. Garrard and Paulin v. Howser, *supra;* Hagerty v. Powers,, 66 Cal. 368; Chaddock v. Plummer, 88 Mich. 225; Brohl v. Lingeman, 41 *ib.*

711; Kumba v. Gilham, 103 Wis. 312; Paul v. Hummel, 43 Mo. 119; Scott v. Watson, 46 Me. 362.

The suit was commenced October 17, 1902, and the trial occurred at the December term, 1906, of the court, commencing December 17, 1906, more than four years from the time of commencement of the suit. There have been two trials of this cause, and the presumption is that all witnesses having any knowledge of the facts were produced and testified. Therefore, we perceive no good to be subserved by remanding the cause, and will dispose of it as did the Supreme Court in Peaslee v. Glass and other like cases when that court passed on questions of fact. The judgment will be reversed.

*Reversed.*

Mr. Justice Brown dissenting in part:

I do not oppose the reversal of this judgment on the ground that it is against the weight of the evidence in the record. I think a new trial should have been granted below on that ground. The case turns upon the negligence of the defendant in allowing his infant son to use the air gun. The jury were properly instructed to that effect and that the father was not liable for the tort of his child, unless such negligence was shown. In my opinion, the question of whether the defendant was so negligent depends principally on the credibility of the witnesses. I do not think that plaintiff's story is entirely unaided by elements of probability, although her testimony seems to be outweighed.

I think, therefore, that the cause should be remanded for another trial before another jury, and that if such other jury should again find for the plaintiff, even on the same evidence, the verdict should then be allowed to stand.